UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Jack B. Kirsch,

    Plaintiff,

v.

St. Paul Motorsports, Inc. d/b/a
St. Paul Harley-Davidson/Buell, and
Wild Prairie Motorsports, Inc. d/b/a
Wild Prairie Harley-Davidson/Buell,

    Defendants.

**MEMORANDUM OPINION AND ORDER**
Civil No. 11-2624

_____

    James H. Kaster and Katherine M. Vander Pol, Nichols Kaster, PLLP, Counsel for Plaintiff.

    Tamara L. Novotny, Cousineau McGuire Chartered, Counsel for Defendants.

_____

This matter is before the Court on Defendants' motion for summary judgment. (Doc. No. 32)

**I.    Introduction**

Plaintiff was hired in July 2000 by Defendant St. Paul Motorsports, Inc. d/b/a St. Paul Harley-Davidson/Buell ("SPHD") as a line technician. He was later transferred to Wild Prairie Motorsports, Inc. d/b/a Wild Prairie Harley-

1

Davidson/Buell ("WPHD") and promoted to Technical Advisor. He was laid off during a reduction-in-force ("RIF") in May 2009. In this action, Plaintiff claims that Defendants did not institute a bona fide RIF and that he was terminated because of his age. He has asserted claims for age discrimination under federal and state law.

## II. Facts

Plaintiff was hired at SPHD as a line technician when he was 48 years old. At the time of his hire, Dan Sagisser was the Technical Advisor at SPHD, a position above the line technician. (Vander Pol Aff., Ex. C (Sagisser Dep. at 11).) As a line technician, Plaintiff was responsible for routine maintenance and specific mechanical issues with motorcycles. (Id. Ex. E (Kirsch Dep. at 18); Ex. A (Fillmon Dep. at 50).) Plaintiff established himself as an effective and capable technician and that his colleagues considered him to be knowledgeable. (Id. Ex. C (Sagisser Dep. at 18-19, 27); Ex. A (Fillmon Dep. at 117); Ex. D (Mitchell Dep. at 16); Ex. G (Giannetti Dep. at 34-35).)

While Plaintiff did quality work, his proficiency tended to be at the lower end. (Id. Ex. D (Mitchell Dep. at 25-27); Ex. E (Kirsch Dep. at 33).) Proficiency is measured by the number of hours a technician bills versus the amount of time

2

they had available to work. (Id. Ex. G (Giannetti Dep. at 40).) At his deposition, Plaintiff conceded that his proficiency was low and that he needed to improve. (Id. Ex. E (Kirsch Dep. at 33, 98-99, 161).) Plaintiff attributes his low proficiency rating to the fact that he spent time mentoring and assisting other technicians, and because he was given difficult diagnostic jobs. (Id. Ex. E (Kirsch Dep. at 99-100, 169).) Plaintiff further asserts that other, more experienced technicians had historically low proficiency ratings as well. (Id. Ex. B (Blomgren Dep. at 50, 96); Ex. C (Sagisser Dep. at 28-29).)

In February 2008, Defendants opened a second shop in Eden Prairie - the WPHD. Prior to the opening of WPHD, Plaintiff was approached by L.J. Fillmon, the Service Department Manager for both SPHD and WPHD, and asked if he wanted to transfer to WPHD, and that he would be promoted to Technical Adviser if he did transfer. (Id. Ex. E (Kirsch Dep. at 42-43). Plaintiff agreed to the transfer and the promotion.

The role of the Technical Advisor is to mentor technicians, ensuring productivity and quality work on the shop floor, acting as a liaison between management and the technicians, addressing concerns with management, handling interpersonal or behavior issues, ordering parts and tools and assisting

sales staff and service writers. (Id. Ex. H (Job Description); Ex. C (Sagisser Dep. at 14-17); Ex. E (Kirsch Dep. at 43).) While Plaintiff worked at WPHD, he occasionally had discussions with other technicians about behavior that he deemed unacceptable. For example, Plaintiff spoke with line technician Dan Donahue regarding the cleanliness of his work station. (Id. Ex. E (Kirsch Dep. at 79-80).) Plaintiff also addressed the issue of certain technicians playing their radios too loud at a technician meeting. (Id. at 49.) Plaintiff admits that not all line technicians were receptive to his professional mentorship or leadership. For example, line technician Chuck Langland was transferred to WPHD from SPHD, and Plaintiff was warned that he may be difficult to manage. (Id. at 74-75.) Plaintiff asserts that concerns about Langland were well-founded, as Langland repeatedly disregarded the chain of authority established to access parts and supplies by not going through Plaintiff. (Id. at 74-78.)

Defendants assert that after Plaintiff was transferred to WPHD, Plaintiff experienced teaming issues with almost all the other technicians. Plaintiff's supervisor, Fillmon, testified that it was not uncommon to hear about conflicts Plaintiff had with other technicians. (Id. Ex. A (Fillmon Dep. at 89-91, 201).) Defendants further assert that several of the technicians expressed frustration

4

with Plaintiff: that he was flustered by his leadership role; Plaintiff accused another technician of stealing parts; accusing another of giving parts away; and shouting at technicians across the shop. (Novotny Aff., Ex. 3 (Employee Statements).)

Despite Defendants' concerns about his performance as a Technical Advisor, in Plaintiff's Performance Review dated December 31, 2008, Plaintiff was ranked "Exceeds Expectations" in most areas. He received "Exceeds Some Expectations" in the areas of "Proficiency", "Communication" and "Conflict Resolution." (Id. Ex. 5.)

Plaintiff alleges that in March or April 2009, Sagisser informed Plaintiff and Glen Olson that Defendants wanted to hire younger employees. (Vander Pol Aff., Ex. E (Kirsch Dep. at 132-33).) At about this time, management was discussing the possibility of a RIF, as the economic downturn caused business to slow in 2008 and 2009. (Id. Ex. G (Giannetti Dep. at 49); Ex. E (Kirsch Dep. at 34-35).) In addition, the economic downturn happened at the same time as the WPHD opened, causing additional financial stress. (Id. Ex. G (Giannetti Dep. at 49, 103-04); Ex. E (Kirsch Dep. at 34-35).)

In May 2009, Fillmon put together a list of employees from the Service Department to be included in the RIF. (Id. Ex. A (Fillmon Dep. at 155-56); Ex. V.) Fillmon testified that when he put together the layoff list, he looked at employees who had behavioral issues, not meeting expectations, and had low proficiencies. (Id. Ex. A (Fillmon Dep. at 158, 161, 197, 214-15).) Included on the list was Plaintiff and Glen Olson - two of Defendants' oldest employees. (Id. Ex. V.) The other oldest employee, Sagisser, was not included on the list, but Sagisser was part of the RIF discussions and would not have recommended himself for layoff. (Id. Ex. C (Sagisser Dep. at 67); Ex. U.) The layoff list was approved by the owner of SPHD and WPHD, Tom Giannetti. (Id. Ex. G (Giannetti Dep. at 49-51).) At a management meeting, Giannetti expressed that it was okay to layoff mediocre employees - such as those with poor attitudes, work ethic and quality of work. (Id. at 95-96.)

Around May 12, 2009, Plaintiff attended a meeting with Fillmon, Sagisser and Lunette Blomgren of Human Resources. During this meeting, they discussed Plaintiff's teaming and interpersonal problems. (Id. Ex. E (Kirsch Dep. at 72-94); Ex. X.) At the end of the meeting, Plaintiff was stripped of his technical advisor role. (Id. Ex. Y (Minutes of May 13, 2009 Meeting); Ex. E (Kirsch Dep. at 157-58).)

Shortly thereafter, on May 21, 2009, Plaintiff was terminated as part of the RIF. Plaintiff, age 57, and Olson, age 62, were laid off, as were younger technicians, ages 22, 25 and 26. Two additional employees were also terminated as part of the RIF on May 21, 2009, ages 19 and 44. Defendants assert that nine other employees were laid off in the subsequent months, one was 19, four were in their 20s, one in his 30s and three in their 40s. (Novotny Aff., Ex. 4 (Layoff Chart).)

Plaintiff's position was not filled for several months. However, in November 2009, Defendants hired Dan Hein, who was 45 years old as a Technical Advisor. Hein was asked whether he preferred to work in St. Paul or Eden Prairie, and he chose St. Paul. (Id. Ex. G (Giannetti Dep. at 121).) As a result, Sagisser was transferred to Eden Prairie, and stepped into Plaintiff's old position as Technical Advisor. (Id. at 120; Ex. C (Sagisser Dep. at 33).)

Between March and June 2009, Defendants hired six new technicians - all of whom were under the age of 40. (Exs. FF, GG; B (Blomgren Dep. at 66-69).) Defendants also recalled or rehired many younger, less experienced service employees. (Id. Ex. B (Blomgren Dep. at 166-67, 203-04); Exs. FF and GG.) When Plaintiff learned that Defendants were recalling or rehiring employees, he contacted them in April 2010. (Id. Ex. E (Kirsch Dep. at 107-09).)

Plaintiff spoke with the Service Department Manager, Brent Godwin, who had called to ask if Plaintiff wanted to come in and talk about a line tech job that was available. (Id. at 109.) Godwin had been hired in March 2010 and had no knowledge of Plaintiff or his work history with Defendants. (Novotny Aff., Ex. 2 (Godwin Dep. at 13-15).) Godwin testified that during his meeting with Plaintiff, he told Plaintiff that he was not hiring at that time, but that he was considering expanding in the future. (Id. at 17.) Godwin further told Plaintiff he would only be hiring line technicians, but that it seemed to him that Plaintiff was more interested in returning to a mentoring or supervisory role. (Id. at 30.) Godwin had also explained to Plaintiff that he had to maintain a proficiency average well over 80%. (Id. 45-46.) Plaintiff expressed that was higher than he was capable of and more than he had normally hit, which was 60-65%. (Id. at 30, 45-48.) Finally, Plaintiff also expressed that he expected to return to work at the same rate of pay, benefits, vacation, and seniority that he had when he was laid off. (Id. at 18; Vander Pol Aff., Ex. E (Kirsch Dep. at 113-14).) Godwin told Plaintiff he would have to discuss such issues with others. (Id. 21-22, 30.)

Ultimately, Godwin did not rehire Plaintiff. (Id. at 46.) Godwin had

8

concerns that if he hired Plaintiff, he might have difficulties managing him. (Id. at 40-41.)

Plaintiff filed a charge of discrimination with the City of St. Paul Department of Human Rights and Equal Economic Opportunity in May 2010 ("SPDHR") (Vander Pol Aff., Ex. MM.) After investigating Plaintiff's claim, the SPDHR found there was probable cause that Defendants violated Plaintiff's rights. (Id. Ex. NN.)

### III. Standard for Summary Judgment

Summary judgment is appropriate if, viewing all facts in the light most favorable to the non-moving party, there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The party seeking summary judgment bears the burden of showing that there is no disputed issue of material fact. Celotex, 477 U.S. at 323. "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case." Amini v. City of Minneapolis, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 252 (1986)).

9

## IV. Analysis

The Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 623(a)(1) and 631(a) prohibits discrimination against employees over the age of 40. Similarly, the Minnesota Human Rights Act ("MHRA"), Minn. Stat. § 363A.08, subd. 2(2)(3), prohibits discrimination in employment on the basis of age. Claims arising under the MHRA are considered under the same analysis as claims arising under the ADEA. Chambers v. Metropolitan Prop. and Cas. Ins. Co., 351 F.3d 848, 855 (8th Cir. 2003).

A claim under the ADEA may be proved by direct or circumstantial evidence. Id. Where there is a lack of direct evidence of discrimination, Plaintiff can prove his claim under the McDonnell Douglas burden shifting analysis. Under this framework, Plaintiff must first establish a prima facie case of discrimination.

### A. Prima Facie Claim

The elements of a prima facie claim of age discrimination are: 1) that Plaintiff was over the age of 40 years; 2) he was qualified for his position; 3) he was terminated; and 4) that he was replaced by someone sufficiently younger to permit an inference of age discrimination. Ramlet v. E.F. Johnson Co., 507 F.3d

1149, 1153 (8th Cir. 2007). Because Defendants assert that Plaintiff was terminated as part of a RIF, the fourth element is satisfied by showing that age was a factor in the termination. Id. "Without direct evidence of age discrimination, [plaintiffs] may satisfy their burden 'by presenting either statistical evidence (such as a pattern of forced early retirement or failure to promote older employees) or "circumstantial" evidence (such as comments and practices that suggest a preference for younger employees.)" Rahlf v. Mo-Tech Corp., Inc., 642 F.3d 633, 637 (8th Cir. 2011) (quoting Chambers, 351 F.3d at 856).

The Court finds that on this record, Plaintiff has put forth evidence to support a prima facie case. Plaintiff was 58 years old when his position was terminated through a RIF, and there is evidence in the record that he was qualified for his position. Plaintiff has also demonstrated fact issues as to whether age may have been a factor in his termination.

The Court notes that throughout his employment, Plaintiff received outstanding employee performance reviews, including his last performance review in which he received "Exceeds Expectations" in all but two categories, and in those two categories, he received "Exceeds Some Expectations." Given this work history, a fact question is raised by Defendants' assertion that Plaintiff

was chosen for layoff due to problems with his work performance.

In addition, Plaintiff has demonstrated that there are fact questions as to whether Plaintiff was terminated pursuant to a bona fide RIF. Plaintiff asserts there is no evidence that written criteria or guidelines were created for conducting the RIF. Instead, managers were given vague instructions, such as choose employees for layoff "who are in any way not the best employees" or who were "mediocre." (Id., Ex. B (Blomgren Dep. at 58); Ex. G (Giannetti Dep. at 50-51;) Ex. EE.) There was no quota or specific number of employees that had to be included in the RIF. (Id., Ex. A (Fillmon Dep. at 162).) In addition, Plaintiff asserts that Defendants were hiring new employees at the same time that they were terminating positions. (Id. Ex. B (Blomgren Dep. at 66); Exs. FF, GG, HH.) Between March and June 2009, Defendants hired six new technicians, all of whom were under the age of 40 and had less experience than Plaintiff. (Id.) Where there is a lack of evidence of a need of a RIF or there is no evidence of an objective plan for implementing a RIF, the legitimacy of the RIF may be called into question. Gaworski v. ITT Comm. Fin. Corp., 17 F.3d 1104, 1110, 1118 (8th Cir. 1994); Hillins v. Marketing Architects, Inc., 808 F. Supp.2d 1145, 1152-1153 (D. Minn. 2011) (finding genuine issue of fact as to whether RIF was bona fide

where there was no objective evidence of decline in business and no evidence of objective criteria by which to determine which jobs were eliminated).

The Court further finds that Plaintiff has put forth evidence that he may have been replaced by a younger employee. After Plaintiff's termination in May 2009, his employment duties were redistributed about other employees at WPHD. In November 2009, however, Defendants hired Daniel Hein, age 45, as a Technical Advisor. Although Hein eventually went to SPHD, and Sagisser - the previous Technical Advisor at SPHD- was transferred to WPHD, Hein was hired at a time when the job opening was at WPHD.

Plaintiff has also submitted evidence that when he learned that Defendants were recalling employees terminated in May 2009, Plaintiff contacted Defendants to determine if there were any open technician positions. (Id., Ex. E (Kirsch Dep. at 107-09); Novotny Aff. Ex. 2 (Godwin Dep. at 14-15).) Plaintiff eventually spoke with Godwin in 2010, but there is a fact question as to whether Defendants were hiring a line technician at the time. Plaintiff recalls that a position was available while Godwin testified that no positions were available, and that he spoke with Plaintiff in the event positions would open in the future. Plaintiff asserts that it was clear that he was interviewing for a line technician job, and that he requested

to be hired at the same rate of pay and seniority he had at the time of his termination because he knew that other recalled employees had been rehired on such terms. (Id. Ex. E (Kirsch Dep. at 110-111).)

### B. Legitimate, Non-Discriminatory Business Reason for Termination

Defendants have proffered a legitimate, non-discriminatory reason for terminating Plaintiff's employment - he was terminated pursuant to a RIF; his teaming and interpersonal relationship issues with nearly everyone at WPHD were poor; and because of his historically low proficiency ratings.

### C. Pretext

The Court finds that there are genuine issues of fact as to whether Defendants' reasons for terminating Plaintiff are a pretext for age discrimination. As set forth above, there are fact questions as to whether the RIF was bona fide and whether Plaintiff was terminated based on poor performance.

Plaintiff has also put forth evidence of possible age animus. In March or April 2009, Sagisser is alleged to have told Plaintiff and Olson that Defendants wanted to hire younger employees. (Id., Ex. E (Kirsch Dep. at 132-33).) Sagisser also allegedly warned Plaintiff that "they" had better watch themselves as Defendants wanted to hire young blood. (Id.)

IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment [Doc. No. 32] is DENIED.

Date: May 7, 2013

                                        s/ Michael J. Davis
                                        Michael J. Davis
                                        Chief Judge
                                        United States District Court